UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| MARKISHA CUNNINGHAM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case Number: 7:23-cv-1379-ACA |
| ) | |
| MERCEDES-BENZ U.S. ) | |
| INTERNATIONAL, INC. et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

Plaintiff Markisha Cunningham filed this action against Defendants Mercedes-Benz US International Inc. ("MBUSI"), NAOS On-Site Staffing LLC, and Onin Staffing LLC, alleging that they (1) failed to promote her and terminated her based on race discrimination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1) ("Count One"); (2) terminated her based on race discrimination, in violation of 42 U.S.C. § 1981 ("Count Two"); (3) failed to promote her and terminated her based on sex discrimination, in violation of Title VII ("Count Three"); and (4) retaliated against her, in violation of Title VII and § 1981 ("Counts Four and Five"). (Doc. 25).

Although Ms. Cunningham served the initial complaint on all Defendants (docs. 4–6), only MBUSI and Onin Staffing appeared in the case.[1] They have separately moved for summary judgment. (Docs. 43, 45). Ms. Cunningham's responses concede Counts Four and Five against MBUSI and all claims against Onin (doc. 50 at 1 n.1; doc. 51 at 1 n.1, 2 ¶ 5; doc. 52 at 3 n.1). Accordingly, the court **WILL GRANT** MBUSI's motion for summary judgment with respect to Counts Four and Five, and **WILL GRANT** Onin's motion for summary judgment without further discussion. The court also **WILL GRANT** MBUSI's motion with respect to Counts One, Two, and Three because Ms. Cunningham has not presented evidence sufficient to create a genuine dispute as to any material fact.

I. **BACKGROUND**

When approaching a motion for summary judgment, the court "view[s] the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve[s] all reasonable doubts about the facts in favor of the non-movant." *Washington v. Howard*, 25 F.4th 891, 897 (11th Cir. 2022) (quotation marks omitted). Where the parties have presented evidence creating a dispute of fact, the court's description of the facts adopts the version most favorable to the nonmovant. *See id.*; *see also Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th

---

[1] The court will address Ms. Cunningham's failure to prosecute her claims against NAOS in a separate order.

Cir. 2020) ("The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts."). Ms. Cunningham has disputed only three of MBUSI's facts. (*See* doc. 52 at 3–4). Accordingly, the court deems the other assertions of fact as undisputed for purposes of this motion. *See* Fed. R. Civ. P. 56(e)(2).

MBUSI runs a training program called the Mechatronics Program, where students take course work at Shelton State Community College and do on-the-job training at an MBUSI facility. (Doc. 44-3 at 2 ¶¶ 2–4). After participants have been in the Mechatronics Program for about a year and a half, MBUSI decides whether they will progress into a maintenance apprenticeship program known as the "IMMAP" or be offered a production position with MBUSI. (Doc. 44-3 at 3 ¶¶ 9–10). It is undisputed that selection for the IMMAP is more favorable than being offered a production position.

Ms. Cunningham, a Black woman (doc. 25 at 2 ¶ 9; doc. 26 at 3 ¶ 9), was a participant in the Mechatronics Program (*see* doc. 44-1 at 15). Her assigned mentor was Sean Winkleblack, who worked under Andrew Carlisle, Randy Treadway, and Allan Perry. (Doc. 44-4 at 3 ¶ 7). Near the end of the initial year and a half period, Ms. Cunningham had a meeting with Mr. Perry and Mr. Carlisle at which Mr. Perry complimented her work but also told her that she needed to come in to work at the same time as her own team and not some other. (Doc. 44-1 at 22).

Ms. Cunningham had several unpleasant interactions with other "team member[s]" during her time in the program. On two occasions, an unidentified person asked her why she was wearing maintenance coveralls. (Doc. 44-1 at 39). Another time, a white male employee aggressively questioned and berated her about clocking in. (*Id*. at 44–45). Several white supervisors would watch her from above the floor while she made repairs, and one once asked to walk her out, to her discomfort. (*Id*. at 43–45). One employee told her that maintenance was "man's work." (*Id.* at 40). Unidentified employees would say things like, "My niece can't even use a screwdriver," "My wife wouldn't even climb a ladder," or "My little girl wouldn't want to do anything like this." (Doc. 44-1 at 42).

Near the end of the program, Mr. Treadway completed an evaluation of Ms. Cunningham. (Doc. 44-2 at 2–5). On the first page, he wrote that Ms. Cunningham "had a difficult start in the shop" and needed "to learn the demand it takes to be in maintenance. She has improved since our discussion about being at work on Friday and Saturday times. [She] has a difficult time due to religious obligations for her to be here the full time on Sat[urday]." (Doc. 44-2 at 2). Mr. Treadway also indicated that Ms. Cunningham needed to work on her programmable logic control skills "and overall shop knowledge" and "[d]ecide if she can put the time and dedication in to work maintenance at MBUSI." (*Id*.).

4

The rest of the evaluation rated Ms. Cunningham on a variety of areas. (*See id.* at 4–5). On a scale of 1 to 5, with 5 being "Exceeds Expectations" and 3 being "Meets Expectations," Ms. Cunningham scored a 3.5 for safety and awareness, a 3 for teamwork, a 2.75 for quality, a 3 for customer relationship, a 3.2 for job progress, and a 2.6 for attendance. (*Id.*). Participants who received "an overall '3.0' Progress Evaluation" would also receive a "Potential Appraisal" measuring the participant's "[r]eadiness for the next level." (Doc. 44-2 at 3). Ms. Cunningham received a "Potential Appraisal," but Mr. Treadway concluded that she was not yet ready for promotion because she did "not exhibit skills required for the next level" and needed "to complete one or more development steps to improve skills required to be considered as potential for the next level." (*Id.*). Mr. Treadway wrote: "Have not seen enough out of [Ms. Cunningham's] progression. I see some improvement when I am present to observe. She is still no where [sic] close to where she could have been at this time with better effort." (*Id.*).

Mr. Perry approved Mr. Treadway's evaluation. (Doc. 44-4 at 4 ¶ 13). Mr. Perry testified that he found Ms. Cunningham's job performance wanting based on his own observations as well as on information supplied by other supervisors, including Messrs. Treadway, Carlisle, and Winkleblack. (*Id.* at 3 ¶ 10). Mr. Perry explained that Ms. Cunningham "was not proactive," "she did not stay with her mentor and follow him on maintenance calls," "she spent excessive time on her cell

5

phone," "at times she was hard to find," "she would spend excessive time talking with [other participants]," and "she made no effort to learn and was unmotivated." (*Id*. at 3–4 ¶ 11).

Near the end of the program, MBUSI human resources representative Wade Smith sent an email to various supervisors, including Mr. Perry and Mr. Treadway, noting that of the thirty-five participants, twenty-three had been recommended for the IMMAP. (Doc. 44-8 at 2–4). Nine others, including Ms. Cunningham, would be offered production positions because they did not meet both the GPA requirement and receive a promotion-ready evaluation rating. (*Id*.). Three participants would not receive any offer. (*Id*.). Mr. Smith's email asked the supervisors if they were "sure" that the participants who had the minimum GPA but did not receive the minimum evaluation score should not go to the IMMAP. (*Id*.). Messrs. Treadway and Perry did not disagree with the decision not to send Ms. Cunningham to the IMMAP. (*Id*. at 2).

Several months later, Mr. Smith held a meeting with the Mechatronics Program participants. (Doc. 44-3 at 3 ¶ 12). At its conclusion, he met separately with Ms. Cunningham and two others in the program, both white men. (*Id*. at 3 ¶ 13; doc. 44-4 at 2 ¶ 5). Mr. Smith advised each of them that they had not been selected for the IMMAP but would be offered production positions with MBUSI. (Doc. 44-3 at 3–4 ¶¶ 14–15). When Ms. Cunningham asked Mr. Smith why she was not selected

for the IMMAP, he told her that Mr. Treadway had reported she was not sufficiently motivated and if she wanted additional information, she should talk to Mr. Treadway, Mr. Carlisle, or Mr. Perry. (Doc. 44-1 at 24, 25). Mr. Smith also said that she and the other two participants could continue in the Mechatronics Program so they could try again to progress to the IMMAP. (*Id*. at 25).

After Ms. Cunningham returned to her work area, Mr. Winkleblack approached her. (Doc. 44-1 at 26). Ms. Cunningham told him about her meeting with Mr. Smith and asked what she could do to improve her standing. (*Id*.). Mr. Winkleblack told her she would have to talk to Mr. Treadway. (*Id*. at 26-27). When Ms. Cunningham asked where Mr. Treadway was, Mr. Winkleblack paged Mr. Carlisle. (*Id*. at 27). The conversation lasted about five to ten minutes, during which Ms. Cunningham was calm and quiet. (Doc. 44-1 at 26).

When Mr. Carlisle arrived and began speaking alone with Mr. Winkleblack, Ms. Cunningham approached and asked why she was viewed as unmotivated and had not been chosen for the IMMAP. (*Id.* at 27–28). Mr. Carlisle said, "We don't see you around much." (*Id*. at 28–29). Ms. Cunningham protested that he could not know when she arrived and asked for specific examples of times she had not stayed for the minimum hours required. (*Id*.). Mr. Carlisle did not provide any examples but told her, "Maybe maintenance isn't for you." (Doc. 44-1 at 28–29).

7

While this conversation was going on, Mr. Carlisle or Mr. Winkleblack paged Mr. Perry, who sent Ms. Cunningham to speak with Mr. Smith. (Doc. 44-4 at 4 ¶ 17; doc. 44-1 at 28; doc. 44-4 at 5 ¶ 18; doc. 44-3 at 4 ¶ 16). Once Ms. Cunningham left, Messrs. Carlisle and Winkleblack told Mr. Perry that Ms. Cunningham had confronted them and was belligerent. (Doc. 44-4 at 5 ¶ 19).

Instead of going to see Mr. Smith, Ms. Cunningham went to a different area of the shop and began speaking with two other employees. (Doc. 44-1 at 32). When Mr. Smith called Mr. Perry an hour later to say Ms. Cunningham had not been to see him, Mr. Perry found her and again instructed her to go see Mr. Smith. (Doc. 44-1 at 32, 33; doc. 44-3 at 4 ¶ 17; doc. 44-4 at 4 ¶ 20). Sometime later, Mr. Smith called again and reported that Ms. Cunningham still had not come. (Doc. 44-4 at 5 ¶ 21). Mr. Perry found her talking to other employees in another part of the shop and directed her for a third time to go see Mr. Smith. (Doc. 44-1 at 33; doc. 44-4).

This time Ms. Cunningham complied. (*See* doc. 44-3 at 4 ¶ 19). She told Mr. Smith that she felt like she was "the kid being picked on in school." (Doc. 44-1 at 34). Mr. Smith encouraged her to "just cool down" and reassured her that everything was "okay." (*Id*. at 34). He told her to go home, come back the following Friday, and that MBUSI would "get [her] another assignment next week" in a different department. (Doc. 44-1 at 34; *see also* doc. 44-3 at 4 ¶¶ 19–20).

8

In the meantime, Mr. Perry decided to terminate Ms. Cunningham "based on [her] unprofessional conduct that day, her confrontations with [Mr. Winkleblack] and [Mr. Carlisle], her wandering around the plant talking to others while on work time, and her failure to follow [his] instruction and meet with Wade Smith." (Doc. 44-4 at 5 ¶ 24). But no one told Ms. Cunningham about this decision. (Doc. 44-1 at 35–36, 54). When she returned to the facility the following Friday, Mr. Smith informed her of her termination. (*Id*. at 35–36).

## II.   DISCUSSION

After Ms. Cunningham's concessions, the only claims remaining are her claims of race and sex discrimination in violation of Title VII and § 1981. The court pauses here to address the precise scope of those claims. In her brief, Ms. Cunningham states that she has brought racially and sexually hostile work environment claims. (Doc. 52 at 3–4). But Ms. Cunningham's amended complaint makes no mention of a hostile work environment of any kind. (*See generally* doc. 25). Nor does her amended complaint present any argument in support of a hostile work environment claim. (*See* doc. 52). Ms. Cunningham may not raise new claims at the summary judgment stage through arguments in her brief. *See Poer v. Jefferson Cnty. Comm'n,* 100 F.4th 1325, 1337–38 (11th Cir. 2024). Accordingly, the court limits its discussion to the claims Ms. Cunningham actually brought: that MBUSI

discriminated against her based on her race and sex when it terminated her and when it failed to promote her to the IMMAP.

MBUSI seeks summary judgment on all remaining claims. (Doc. 43). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Title VII prohibits covered employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race [or] sex." 42 U.S.C. § 2000e-2(a)(1). Section 1981 prohibits intentional discrimination "in private employment on the basis of race." *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459–60 (1975). As a general rule, claims brought under Title VII and § 1981 "are subject to the same standards of proof and employ the same analytical framework." *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009). Accordingly, the court will address the claims together.

1. Counts One and Two (Race Discrimination)

Counts One asserts that MBUSI's failure to promote her to the IMMAP and decision to terminate her was race discrimination, in violation of Title VII. (Doc. 25 ¶¶ 54–64). Count Two asserts that MBUSI's decision to terminate her was race discrimination, in violation of § 1981. (*Id.* ¶¶ 65–68).

A plaintiff may prevail on a race discrimination claim in several ways, including by presenting circumstantial evidence satisfying the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803–04 (1973) or by demonstrating a "convincing mosaic of circumstantial evidence that warrants an inference of intentional discrimination." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 & n.6 (11th Cir. 2019) (en banc). A "convincing mosaic" may be shown by evidence, for example, that demonstrates "(1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quotation marks and citation omitted). Ms. Cunningham does not attempt to satisfy the *McDonnell Douglas* test, but instead asserts that she has presented a convincing mosaic. (Doc. 52 at 5–11). The court will therefore limit its discussion to whether Ms. Cunningham has presented sufficient evidence to create a reasonable inference of intentional discrimination. *See Lewis*, 918 F.3d at 1220 & n.6.

With respect to Ms. Cunningham's termination, MBUSI presents undisputed evidence that Mr. Perry made the decision to terminate her because of her conduct after Mr. Smith advised her that she would not proceed to the IMMAP. (*See* doc. 44-4 at 5 ¶ 24); *see Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 843 (11th Cir. 2000) (affirming summary judgment for employer on Title VII race discrimination

claim where the evidence showed without dispute that the plaintiff was discharged for refusing to follow her supervisors' instruction). Ms. Cunningham does not dispute that she repeatedly failed to follow instructions to speak with Mr. Smith and wandered around the plant speaking with other employees. (*See id.*; doc. 52 at 3–11). Indeed, her response does not address how any factfinder could infer that discrimination was the actual basis for her termination. (*See id.* at 7–11). Accordingly, the court **WILL GRANT** MBUSI's motion for summary judgment with respect to Ms. Cunningham's claims of race discrimination arising out of her termination.

With respect to MBUSI's failure to select her for the IMMAP, MBUSI contends that it made its decision based on Mr. Treadway's evaluation, which Mr. Perry approved, finding that she was not ready for promotion because she had not exhibited the required skills and needed to complete "one or more development steps." (Doc. 44-2 at 3). Ms. Cunningham argues that the determination she was not ready for promotion is inconsistent with her overall score of 3.01, which means "Meets Expectations." (Doc. 52 at 8; *see* doc. 44-2 at 2). But a score of 3.01 does not mean that a participant should be promoted; it merely authorizes the supervisor to conduct an appraisal for "Promotion Readiness." (Doc. 44-2 at 3). Indeed, ten other program participants who received scores between 3 and 3.33 also failed the promotion appraisal. (*See* doc. 44-8 at 3–4). Ms. Cunningham's score of 3.01

12

allowed her supervisor to consider whether she was ready for promotion; it did not indicate that she was ready for promotion. (*See id.*).

Ms. Cunningham argues that neither Mr. Treadway nor Mr. Perry signed the evaluation and she never received a copy of it. (Doc. 52 at 8). But Mr. Perry testified that Mr. Treadway completed the form and Mr. Perry reviewed and approved it, and that the evaluation forms are for internal use and are not normally shown to or reviewed with the Mechatronics Program students. (Doc. 44-4 at 4 ¶¶ 13, 16). Ms. Cunningham has not pointed to evidence creating a dispute about that testimony. Mr. Perry testified that, based on his own observations and input from other supervisors, he viewed Ms. Cunningham's job performance as deficient because he believed Ms. Cunningham did not stay with her mentor and follow him on maintenance calls, she spent too much time on her cell phone and talking to other employees, and she "made no effort to learn and was unmotivated." (Doc. 44-4 at 3–4 ¶ 11). Ms. Cunningham has not controverted that evidence. (*See* doc. 52 at 9). And the question for this court is "not the wisdom or accuracy of [the employer's] conclusion that [the plaintiff] was an unsatisfactory employee" but whether the employer's conclusion about the employee's performance was "an honest one." *Rojas v. Florida*, 196 F.3d 1354, 1361 (11th Cir. 1999) (cleaned up

Ms. Cunningham points to the several incidents when white team members or supervisors questioned her credentials or berated her. (Doc. 52 at 10–11). But none

of the incidents involve Mr. Perry, Mr. Smith, or anyone else involved in her evaluation, nor do they overtly relate to her race. *See Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1336 (11th Cir. 2023) (recognizing that comments by the plaintiff's white co-employee that President Obama was "stupid" or the "worst" were not themselves "inherently racial"); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) ("Innocuous statements or conduct, or boorish ones that do not relate to the race of the actor or of the offended party . . . , are not counted.").

Ms. Cunningham has failed to present circumstantial evidence supporting an inference that MBUSI declined to select her for the IMMAP because of race. Accordingly, the court **WILL GRANT** MBUSI's motion for summary judgment with respect to Ms. Cunningham's claims of race discrimination arising out of the failure to promote her.

### 2. Count Three (Sex Discrimination)

In Count Three, Ms. Cunningham alleged that MBUSI discriminated her based on her sex by terminating her employment and by failing to select her for advancement to the IMMAP. (Doc. 25 ¶¶ 69–77).

With respect to Ms. Cunningham's termination, her sex discrimination claim fails for the same reason as her race discrimination claim did: MBUSI presents undisputed evidence that Mr. Perry made the decision to terminate her because of her conduct after Mr. Smith advised her that she would not proceed to the IMMAP

and Ms. Cunningham has not controverted that evidence. (*See* doc. 44-4 at 5 ¶ 24); *see Rice-Lamar*, 232 F.3d at 843 (affirming summary judgment for employer on Title VII race discrimination claim where the evidence showed without dispute that the plaintiff was discharged for refusing to follow her supervisors' instruction). Accordingly, the court **WILL GRANT** MBUSI's motion for summary judgment with respect to Ms. Cunningham's claims of sex discrimination arising out of her termination.

Similarly, with respect to the denial of the promotion to the IMMAP, Ms. Cunningham's sex discrimination claim fails for the same reason her race discrimination claim did. The only difference between the evidence that Ms. Cunningham offers about her sex discrimination claims and her race discrimination claims is that some team members made "sexist comments." (Doc. 52 at 10). But there is no indication that the employees who made such statements played any role in the decisions to reject Ms. Cunningham for the IMMAP. Statements by non-decisionmakers cannot demonstrate discriminatory intent. *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 802 (11th Cir. 2005). The court **WILL GRANT** MBUSI's motion for summary judgment on Count Three.

### III. CONCLUSION

The court **WILL GRANT** Onin's motion for summary judgment (doc. 45) and MBUSI's motion for summary judgment (doc. 43).

The court will enter a separate partial summary judgment.

**DONE** and **ORDERED** this May 9, 2025.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE